FILED

2019 Jan-25 PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM EUGENE SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:17-cv-01253-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF OPINION

Plaintiff William Eugene Sanders ("Sanders" or "Plaintiff"), who is white, brings suit alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981. Before the Court is Defendant Mercedes-Benz U.S. International, Inc.'s ("MBUSI") motion for summary judgment. (Doc. 21.) Sanders has timely filed his opposition. (Doc. 29.) The motion has been briefed and is ripe for review. For the reasons stated below, MBUSI's motion for summary judgment (doc. 21) is due to be granted.

### I.    BACKGROUND[1]

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own

MBUSI hired Sanders as a Team Member ("TM") in March 1997. Sanders was promoted to the Team Leader ("TL") position in 2003. In 2012, Sanders was moved to a TL position in the KVP Shop. In 2014, Susan Warner ("Warner") became the manager over the KVP Shop. Because there was no Group Leader ("GL") in the KVP Shop, Sanders as a TL reported directly to Warner. Warner and Sanders worked well together, and Warner gave Sanders positive evaluations in August 2014 and October 2015. These evaluations noted that Sanders's performance was satisfactory and that he was ready for consideration for advancement to the next level. Due to these evaluations, Warner planned to make Sanders the GL in the KVP shop, once he satisfied certain required assessments.

As part of the process for a promotion to a GL position, MBUSI collects peer input on the potential GL candidates. In response to MBUSI's request for peer input on Sanders, MBUSI received both solicited and unsolicited feedback about Sanders that included a number of complaints about him. Warner was concerned about these complaints so she spoke with Dwight Barger, Jason Jones, Luke Smith,

---

examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotations omitted).

Jack Avery, and Casey Cook, all of whom are white, about the complaints they made.[2] After speaking to these individuals, Warner then turned these complaints over to Human Resources ("HR") for investigation. Among the complaints made about Sanders's demeanor, there were specific allegations that Sanders distributed a survey that used racially insensitive language, that Sanders stated he did not want blacks or females working in the shop, and that Sanders would often force people to work overtime and would interfere with other employee's ability to take vacation days.

Zina Cooper ("Cooper"), Department Manager for Team Relations at MBUSI, initiated an investigation into these allegations. Cooper is African American. As part of her investigation, Cooper interviewed all TMs in the KVP shop. While five of the nine individuals interviewed corroborated the allegations, the remaining four rebutted these complaints. Specifically, Don Shane Flynn and Daniel Wallin, who are both white, stated that they had no recollection of the alleged survey or inappropriate comments that Sanders made. Both also stated they had no complaints about how Sanders treated them. James Snipes, who is white, said he had not heard any inappropriate statements and Randy Channel, who is

---

[2]      Sanders states that he believes Jones, Barger, and Avery made complaints about him because they were disgruntled with him due to his criticisms of the quality of their work. (Doc. 29 at 20.)

white, stated that Sanders was the best person he ever worked for. Cooper informed Sanders that she was investigating complaints about him and then suspended him for the remainder of her investigation.

Cooper's report ultimately found that enough witnesses had confirmed Sanders behavior and suggested termination. However, the alleged survey Sanders supposedly handed out was not found on his personal computer or any MBUSI computer. Cooper presented her report to Sr. Manager David Olive ("Olive"), a white male who had known Sanders since 1997. Olive evaluated the report and discussed it with Cooper. After meeting with Cooper, Olive determined that termination was too severe of a punishment based on the conflicting evidence and the lack of leadership training Sanders had received, which Olive believed may have contributed to some of Sanders's behavior.

On December 22, 2015, Sanders met with Olive, Cooper, and Warner and was informed that he was being demoted to a TM position in the body shop as a result of the investigation. Sanders was also issued a level 3 Corrective Performance Review (CPR), even though he had not had any prior complaints about his behavior. Given his strong work history and the small number of people complaining, Sanders believed the results of the investigation to be improvident

and discriminatory. After a discussion with Warner, Sanders insisted that he would continue his efforts to clear his name.

In March of 2016, Sanders filed an EEOC charge against MBUSI regarding its investigation into his behavior. Sanders then applied for a Quality TM position in April 2016. Due to his recent discipline, Sanders was not eligible for the position. Plaintiff also asserts that he applied for an X167 project position in 2016 but was not chosen. Almost a year later, in February of 2017, Sanders applied for a Quality SQO position- job posting 1532. In August 2017, Sanders contacted Frank Walls, Jr. ("Walls") his Team Relations Representative, to ask why he had not heard back from HR on his application for the Quality SQO position.

Walls then spoke to Valerie Banta ("Banta"), MBUSI's HR Specialist-Employment, about why Sanders had not been interviewed. Banta told Walls that "Sanders did not qualify for the position and that by the way Sanders had a lawsuit that Legal was handling so to be careful what he said." (Doc. 23-5 ¶7.) Walls then communicated to Sanders Banta's statement "that everything dealing with Sanders had been sent to Legal because Sanders had a lawsuit." (Doc. 23-6 ¶3.) However, Sanders recollection of this conversation with Walls was that Walls told him that "because [he] had filed a lawsuit against the company, that [he] wasn't eligible for the job; that everything pertaining to [Sanders] had been moved to Legal. [He]

wasn't considered for the job because [he] had filed a lawsuit." (Pl. Dep. at 186.) Ultimately, job posting 1532 for the Quality SQO position was pulled and no one was hired to fill the position. In October of 2017, MBUSI posted an opening for a MPS specialist. Sanders applied for the job but did not get the position. In December 2017, the Quality SQO position was reposted, and Sanders did not apply for the position.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[3] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.  DISCUSSION

Title VII prohibits, among other conduct, "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (Both of these statutes [i.e., section 1981 and Title VII] have the same requirements of proof and use the same analytical framework.").

In cases where the only evidence of discrimination is circumstantial, the court must "analyze the claim under the McDonnell Douglas framework, which requires the plaintiff to create an inference of discrimination through her prima facie case." *Springer v. Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (race discrimination). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the employer meets this burden, the plaintiff

must show that the proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

Although the *McDonnell Douglas* framework is one way of showing discriminatory intent, it is not the only way to show discriminatory intent in a Title VII or § 1981 discrimination claim. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir.2011) ("establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case"). According to the Eleventh Circuit, "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir.2013) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)).

### a. RACE DISCRIMINATION

Plaintiff argues that he was discriminated against based on his race when he was demoted from a TL to a TM position. To establish a prima facie case of racial discrimination, the plaintiff must demonstrate that (1) he belongs to a protected class; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he

was qualified to perform the job. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). MBUSI contends that Sanders has failed to identify a similarly situated comparator who was treated more favorably. Sanders, for his part, does not appear to dispute MBUSI's assertion that he cannot identify a comparator or that he cannot establish a *prima facie* case.[4]

Instead, Sanders argues that his "failure to produce a comparator [or make out a *prima* facie case] does not necessarily doom [his] case" as he had created "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith*, 644 F.3d at 1328.[5] Sanders argues that intentional discrimination can be inferred because "Defendant's sole reason for failing to promote Plaintiff and subsequently demoting him from a position he had held for some 13+ years was that three disgruntled employees had made statements about him that were, at best, questionable and contradicted by other employees, including Plaintiff." (Doc. 29 at 23.)

Yet, the circumstantial evidence Sanders alleges shows intentional discrimination lacks any basis for a reasonable jury to conclude that unlawful

---

[4]    Plaintiff concedes that there is no direct evidence of race discrimination, and he does not rebut Defendant's assertion that he cannot establish a *prima facie* case of race discrimination.

[5]    To the extent Sanders relies on *Lewis v City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017) to establish a framework for his convincing mosaic argument, the Court notes that the opinion has been vacated by the Eleventh Circuit. *See Lewis v City of Union City*, 893 F.3d 1352, 1352 (11th Cir. 2018).

discrimination occurred. Sanders spends much of his brief quarreling with the wisdom of MBUSI's decision and its investigation while denying vehemently the allegations made against him. Sanders characterizes the complaints against him as the accusations of disgruntled employees, but Title VII and § 1981 do not turn personal disagreements or feuds into impermissible discrimination. *See McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986).

Sanders attempt to litigate the validity of MBUSI's investigation is thus unavailing as it is unaccompanied by any evidence that racial considerations played a role in this allegedly fraudulent and improper investigation. The only evidence Sanders presents as a possible source of unlawful animus is his own conclusion that because some of the complainants and Cooper were African American they must have been motivated by impermissible racial animus. Sanders argues that "[o]ne has to question [Cooper's] motivation behind making such a recommendation [i.e. that he would be fired], without any hard evidence." (Doc. 29 at 25.) However, Cooper's motivation could be based on a number of permissible forms of animus, including general dislike. Absent from Plaintiff's arguments and autopsy of MBUSI's alleged incompetent investigation evidence are facts from which a reasonable jury could assume that Cooper and Sanders's race had anything to do

with the decision.[6] Moreover, the facts indicate that it was Olive, and not Cooper, who recommended Sanders be demoted.

To overcome this fact, Sanders attempts to rely on the "cat's paw" theory of liability. The "cat's paw" theory imputes to an unbiased decision maker the acts of a supervisor that were "motivated by [discriminatory] animus" and "intended ... to cause an adverse employment action," if such acts are the "proximate cause of the ultimate employment action." *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis deleted). Specifically, Sanders alleges that Cooper's unlawful animus, of which there is no evidence, may be imputed to Olive because he acted in accordance with Cooper's recommendation "without independently evaluating the decision." (Doc. 29 at 25–26.)

Yet, Plaintiffs own evidence indicates that Olive was not passive as he reviewed the report before deciding that termination was too harsh of a sanction. Even if Olive was passive and rubber stamped Cooper's decision, the evidence of a possible basis for a jury to find impermissible racial animus, other than evidence of Cooper's race, is completely absent from the record.

---

[6]     Plaintiff alleges that he was treated differently from comparators but does not include an argument that this treatment facilitated the creation of a convincing mosaic. The Court will not construct the picture for Plaintiff. Additionally, the Court finds availing Defendant's argument that Plaintiff is not similarly situated to these alleged comparators.

In sum, Sanders has not presented a "convincing mosaic" of evidence. Nothing in the record suggests that Cooper had anything other than a good-faith belief that Sanders made the alleged comments. *See Winborn v. Supreme Beverage Co.*, 572 Fed. App'x. 672, 674 (11th Cir. 2014) (per curiam) ("If an employer terminates an employee 'because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not because of race.'") (quoting *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987))).

Plaintiff's only evidence of unlawful animus is the fact that Cooper is African American. This fact alone does not create an inference, much less a convincing mosaic, of discrimination. As such, Sanders has not demonstrated a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker," *Smith*, 644 F.3d at 1328, and summary judgment is due to be granted in favor of MBUSI as to Sanders' race discrimination claim under both Title VII and § 1981.

### b. RETALIATION

Sanders asserts that MBUSI denied him a number of promotions in retaliation for his filing of an EEOC charge and subsequent lawsuit against MBUSI

in violation of Title VII and § 1981.[7] A plaintiff successfully establishes a *prima facie* case of retaliation if he demonstrates that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012). In order to establish a causal connection between an employee's protected activity and an adverse employment action, "a plaintiff must show that the relevant decision maker was aware of the protected conduct" at the time the decision was made. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) A retaliation claim "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).

If a plaintiff makes out a *prima facie* case, the burden shifts to the employer to demonstrate that the employment decision was made for a legitimate, nondiscriminatory reason. The burden at this stage "is exceedingly light."

---

[7] Defendant argues that Plaintiff's retaliation claim under Title VII is due to be dismissed for a failure to exhaust. However, under *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981), which is binding precedent in this Circuit pursuant to *Bonner v. City of Pritchard*, acts of retaliation that "grow[] out of an administrative charge that is properly before the court" are not barred. Therefore, Plaintiff's Title VII claim is likely properly before this court. Even if Plaintiff's Title VII claim was barred, Plaintiff's § 1981 retaliation claim would not be barred by a failure to exhaust. Nevertheless, for the reasons discussed *infra,* Sanders's retaliation claims are due to be dismissed.

*Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983). Once the employer articulates a legitimate, nondiscriminatory reason for an adverse employment action, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason [ is] a pretext for discrimination." *Alvarez*, 610 F.3d at 1264. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Kragor v. Takeda Pharmaceuticals Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine,* 450 U.S. at 256). "When a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* at 1310–11 (internal quotation marks omitted).

Plaintiff argues that MBUSI retaliated against him by not choosing him for the following positions (1) a position with the X167 project, (2) a Quality SQO position, and (3) an MPS specialist position.[8]  MBUSI argues in return that Plaintiff is unable to make out a *prima facie* case because (1) he did not engage in protected activity and (2) there is no causal connection between his protected

---

[8]    Plaintiff concedes that he cannot rebut Defendant's legitimate, nondiscriminatory reason for not moving him to a Quality TM position. (Doc. 29 at 30.) Therefore, the Court only proceeds to analyze Plaintiff's remaining claims.

activity and the actions taken as there was no knowledge of his protected activity among decision makers.

MBUSI's argument that Sanders did not participate in protected activity is unavailing. Plaintiff has presented evidence that he engaged in protected activity when he filed an EEOC charge on March 18, 2016 and filed suit in this matter on July 26, 2017. (Doc. 1.);(Pl. Dep. at Ex. 6.)

Additionally, Plaintiff presents evidence from which a reasonable jury could conclude that there was decision maker knowledge at least in regard to the Quality SQO position. Plaintiff has presented evidence that Banta was involved in screening resumes for the Quality SQO position, and that it was Banta who determined Sanders was not qualified for the SQO position. The evidence also indicates that Banta told Walls that Legal was aware of Sanders's charge and suit, had a copy of his file, and that he was to watch what he said to Sanders because of this pending litigation. Walls then told Sanders about his conversation with Banta wherein Sanders recalls that Walls told him that he was not considered for the position because of his suit.

This evidence of a causal link for the Quality SQO position standing alone does not carry the burden for establishing a causal link and decision maker knowledge for the other promotion decisions made by MBUSI. Plaintiff has not

presented evidence that Banta had knowledge of Sanders's lawsuit or EEOC charge when the earlier X167 position decision was posted, nor has Plaintiff presented any evidence indicating when the X167 position was posted. Plaintiff quibbles with the vague dates utilized by MBUSI but then only provides a general allegation that the decision was made sometime in 2016. This assertion does not suffice to suggest a causal link as it does not provide a basis for this Court or a reasonable jury to find that the X167 posting and decision occurred after he filed his EEOC charge in March 2016. Additionally, Plaintiff fails to present any evidence that Banta was involved in screening applicants for any of the other positions Plaintiff applied for after the Quality SQO position, including the later MPS Specialist position. Therefore, Plaintiff is only able to establish a causal link with decision maker knowledge as to the Quality SQO position.[9]

MBUSI asserts that Sanders was not chosen for a Quality SQO position-job posting 1532- because he was not qualified for the position based on his resume and ultimately no one was chosen for the position. Sanders in rebuttal asserts that

---

[9]     The Court is cognizant that Plaintiff alleges that Legal had his employment file and that Banta may have played a role in later job posting and promotion decisions due to her position at MBUSI. However, this Court and a reasonable jury cannot make such assumptions in the absence of evidence offered to support such conclusions or inferences. Moreover, the Court notes that, even if it assumed that Sanders established a *prima facie* case for all three positions, Plaintiff has not presented sufficient evidence of pretext in regard to both the X167 and MPS Specialist positions to survive summary judgment.

MBUSI's explanation is pretextual "because he had worked in Quality and performed all the job duties associated with the position." (Doc. 29 at 31.) In support of this assertion, Sanders points to his own declaration where he states again that "he had worked in Quality and performed all the job duties associated with the position." (Pl. Ex. 5 ¶35.) Sanders points to no other evidence in the record, including the actual resume he submitted to MBUSI, to support this assertion. Therefore, Sanders assertion does little to rebut MBUSI's explanation that he was not qualified for the Quality SQO position based on a comparison of his resume and the objective criteria of the job posting, including appropriate experience with "blueprint reading, [and] measurement equipment." (Banta Dec. ¶6) Plaintiff may have previously worked in the Quality shop and performed some of the same duties, but this general assertion does not provide evidence from which a reasonable jury could conclude that he was qualified for the position.[10]

---

[10]     Plaintiff's resume may have indicated that he met the requirements in the job posting without explicitly referencing the job posting's requirements. However, in the absence of specific evidence proffered by Plaintiff to confirm this, the Court will not assume that MBUSI incorrectly found that Sander's resume did not indicate he met the relevant skills based on his general allegations that he was qualified. Moreover, whether Sanders was qualified for the Quality SQO position or not, MBUSI ultimately pulled the job posting. Therefore, even if MBUSI had considered Sanders for this position there is no evidence that he would have gotten the position because MBUSI pulled the job posting and then hired for the Quality SQO position from a second job posting, which Sanders did not submit an application for.

Sanders argues that he has presented evidence from which a reasonable jury could conclude that his lawsuit played a role in the decision not to hire him for the Quality SQO position. When Walls asked Banta why Sanders had not been interviewed, Banta "told [Walls] that Sanders did not qualify for the position and that by the way Sanders has a lawsuit that Legal was handling so to be careful what he said." (Doc. 23-5 ¶7.) Sanders, in an attempt to discredit Banta's testimony, points to his own deposition testimony in which he claims that Walls told him that Banta told Walls that he was not hired because he had filed suit. Walls's declaration contradicts Sanders assertion as it states that Banta communicated to Walls that "everything dealing with Sanders had been sent to Legal because Sanders had a lawsuit." (Doc. 23-6 ¶3.) Although Walls does not testify that he told Sanders that his suit was why he was not chosen, such evidence, if admissible, could lead a reasonable jury to determine that Sanders recollection is credible and that Walls did in fact tell him that Banta said that Sanders was not chosen because of his suit.

However, Sanders's testimony as to what Walls said Banta said would constitute inadmissible hearsay. A party may not use inadmissible hearsay to defeat summary judgment. *See* FED. R. CIV. P. 56(c) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)

("The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.' ") (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Although the alleged statement by Banta is potentially not hearsay-either because it is not being offered to prove the truth of the matter asserted or because it is an opposing party's statement, *see* FED. R. EVID. 801- Walls's statement to Sanders is hearsay. Sanders is offering Walls's alleged statement, which was made outside of court, to prove the truth of the matter asserted, that Banta made this statement. While this evidence may be admissible to impeach Walls, it does not constitute admissible substantive evidence to show what Banta actually said, and thus the Court cannot consider Banta's alleged articulation of possible retaliatory motives. Therefore, Sanders is unable to demonstrate pretext and MBUSI is entitled to summary judgment on his retaliation claims.

## IV. CONCLUSION

For the reasons stated above, MBUSI's motion for summary judgment (doc. 21) is due to be granted. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on January 25, 2019.

L. Scott Coogler
United States District Judge

195126